DISTRICT OF OREGON
**F I L E D**
December 03, 2015
Clerk, U.S. Bankruptcy Court

Below is an Opinion of the Court.

_____
RANDALL L. DUNN
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

In Re:                              ) Bankruptcy Case
                                    ) No. 14-31498-rld7
DAVID LESTER HOWLAND,               )
                                    ) MEMORANDUM OPINION
                Debtor.             )

On October 8, 2015, I held an evidentiary hearing ("Hearing") on Bank of the Cascades' ("Bank") objection to the claim (Claim No. 20) ("Claim") filed by Justin Howland ("Justin")[1] in the chapter 7[2] case of David Lester Howland ("David"). After admitting exhibits and hearing witness testimony, I closed the evidentiary record and heard argument from counsel. At the close of the Hearing, I gave counsel for the parties time to file supplemental legal memoranda with respect to the following issues: 1) Whether any portion of the Claim should be

---

[1] Justin is David's father. I refer to them by their first names herein to differentiate them. No disrespect is intended.

[2] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. The Federal Rules of Civil Procedure are referred to as "Civil Rules."

Page 1 - MEMORANDUM OPINION

disallowed based on the running of any applicable statute of limitations? 2) Whether the Claim should be subordinated under the provisions of § 510(a) or (c) of the Bankruptcy Code? Following the filing of the parties' legal memoranda,[3] I took the matter under advisement.

In deciding this matter, I have considered carefully the admitted exhibits and the testimony of Justin and David at the Hearing. I also have considered the parties' legal memoranda, and I further have taken judicial notice of the docket and documents filed in David's main chapter 7 case, Case No. 14-31498-rld7, for the purpose of confirming and ascertaining facts not reasonably in dispute. Federal Rule of Evidence 201; In re Butts, 350 B.R. 12, 14 n.1 (Bankr. E.D. Pa. 2006). In addition, I have reviewed relevant legal authorities, both as cited to me by the parties and as located through my own legal research.

In light of that consideration and review, this Memorandum Opinion sets forth the court's findings of fact and conclusions of law under Civil Rule 52(a), applicable with respect to this contested matter under Rules 7052 and 9014.

## I. Relevant Facts

From as early as September 2008 or February 2009 through February 2014, Justin made a series of advances to David or on David's

---

[3] At the Hearing, I advised counsel that I intended to consider only one set of legal memoranda, giving the Bank's counsel until October 13, 2015 to file its memorandum and Justin's counsel until October 27th to file his responding memorandum. Later, in response to correspondence from the Bank's counsel, I authorized the Bank's counsel to file a reply memorandum no later than November 12, 2015, by order entered on October 28, 2015 (Docket No. 128). Following the filing of the Bank's reply memorandum on November 12, 2015, I took the matter under advisement.

Page 2 - MEMORANDUM OPINION

behalf totaling $580,000 ("Advances"). Although Justin and David attempted to document the transactions with promissory notes ("Notes") drafted by David, the Notes were deficient in that they did not include payment terms or maturity dates, and they were signed by Justin as "PAYOR" and David as "PAYEE." See Exhibits 1 and A. The Notes all included "Redding, California" in the line with the date and the amount advanced and provided for interest at the rate of six percent per annum. Justin never demanded payment of any of the Notes and apparently did not retain the original Notes. Hr'g Tr. Oct. 8, 2015, at 28:1-3. At the Hearing, Justin explained his failure to make demand by reiterating testimony from his deposition that:

> Demand was never made because Justin Howland and his son David Howland had an understanding that the loans would be repaid after [David's] businesses stabilized and David was able to take sufficient distributions to repay his debt.

Hr'g Tr. Oct. 8, 2015, at 19:17-21; 20:13-15.

David confirmed his intent to repay Justin in his testimony at the Hearing. Hr'g Tr. Oct. 8, 2015, at 32:21-22. However, at the Hearing, eight of David's financial statements from August 31, 2009 through March 12, 2014 were admitted in evidence, and only the March 12, 2014 (updated March 18, 2014) financial statement included any debts for "Loan Payable – Family/Friends" as liabilities. See Exhibit 6.

David testified that, "[M]y dad had always stated that he would have subordinated to any debt that I was able to procure." Hr'g Tr. Oct. 8, 2015, at 43:14-16. In response to my clarifying question, David confirmed that his deal with his father, Justin, "was that any debt between you [David] and him [Justin] would be subordinated to all of your

Page 3 - MEMORANDUM OPINION

[David's] other debts." Hr'g Tr. Oct. 8, 2015, at 44:5-8. During cross-examination, David further clarified his understanding of the subordination arrangement with his father:

> Question: You mentioned that you and your father agreed that repayment of these would be subordinated to all other creditors. Can you clarify for me what you meant by that?
>
> Answer: [W]hen I mentioned the word "subordinate," at that point in time, I knew that my – if I got any loan, further loan, from the Bank . . . , my Dad's loan would never come into play because he would – he would not demand payment before I paid the Bank . . . . That's what I meant by subordination.

Hr'g Tr. Oct. 8, 2015, at 51:13-15, 23-25; 52:1-3.

David filed for protection in chapter 7 on March 19, 2014. See Main Case Docket No. 1. Justin timely filed the Claim. See Exhibit 4. In the Claim, Justin asserted an unsecured claim for $580,000, without interest, for "Money Loaned." Attached as page 4 to the Claim was an accounting of the amounts advanced by Justin to David, showing dates of the Advances, totaling $580,000. See Exhibit 4, at 4. The Bank does not question that Justin in fact advanced a total of $580,000 to David from as early as September 2008 through February 2014.

## II. Jurisdiction

I have jurisdiction to decide the Bank's objection to the Claim under 28 U.S.C. §§ 1334 and 157(b)(2)(B).

## III. Discussion

### 1. Loans or Gifts?

Both Justin and David testified at the Hearing that they considered Justin's $580,000 in Advances to David as loans. As I mentioned at the Hearing, the Notes are problematic and neither probative

Page 4 - MEMORANDUM OPINION

Case 14-31498-dwh7   Doc 133   Filed 12/03/15

nor enforceable as loan documents because they do not include payment terms or maturity dates, and, worst of all, Justin signed the Notes as "PAYOR" rather than payee, and David signed the Notes as "PAYEE." If any further evidence were needed that Justin and David did not treat the Notes as enforceable, although the Notes provided for interest at six percent, Justin did not claim any interest owed in his Claim, and he did not retain the original Notes so that he could attempt to enforce them.

However, those facts are not necessarily dispositive as to how the $580,000 should be characterized because Justin and David may have had an oral agreement that the $580,000 would be treated as loans that David was obliged to repay. Both California and Oregon follow the Restatement (Second) of Contracts § 1, which defines a contract as "a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." See, e.g., Schaefer v. Williams, 15 Cal. App. 4th 1243, 1246 (Cal. App. 1993); and Ashby v. Emp't Div., 21 Or. App. 265, 268-69 (Or. App. 1975).

In addition to the Howlands' direct testimony that they treated the $580,000 Advances as loans, circumstantial evidence supports that characterization. Justin testified that he made the Advances from his trust that had a net worth of approximately $5 million. He further testified that he also lent some money to his son Craig, who had made some effort at repayment. David testified that he had four siblings and that he was the executor of his father's estate. To the extent he was unable to repay the Advances before his father's death, he would set them off against his right to an inheritance. Both Justin and David testified

Page 5 - MEMORANDUM OPINION

that David was paying off a separate $300,000 obligation to his father, not included in the subject Advances.

Where Justin's trust was worth about $5 million, and he made Advances to one of five children in the amount of $580,000 (in excess of ten percent of the trust's net worth), I do not find it reasonable to assume that such large Advances would be considered gifts at the expense of the interests of David's siblings. The Notes themselves, while they do not represent enforceable obligations on their own, constitute some additional evidence that Justin and David treated the $580,000 Advances as loans. I ultimately find, based on all of the evidence before me, that the total of $580,000 that Justin advanced to David should be treated as loans rather than gifts.

2. <u>Limitations Issues</u>

Under California law, the limitations period for a "contract, obligation or liability" not based on a writing generally is two years. <u>See</u> Cal. Code Civ. Pro. § 339(1). Also, under California law, where no time is specified by which a loan is to be repaid, a presumption arises that the loan is to be treated as a demand obligation, and the statute of limitations begins to run from the time that the loan is made. <u>See, e.g.</u>, <u>Huynh v. Chase Manhattan Bank</u>, 465 F.3d 992, 998-99 (9th Cir. 2006); <u>Miguel v. Miguel</u>, 184 Cal. 311, 314 (Cal. 1920); <u>Dorland v. Dorland</u>, 66 Cal. 189, 190 (Cal. 1884); <u>Buffington v. Ohmert</u>, 253 Cal. App. 2d 254, 256 (Cal. App. 1967); and <u>Taketa v. State Bd. Of Equalization</u>, 104 Cal. App. 2d 455 (1951).

The Bank's position is that if I determine, as I have, that Justin's Advances to David should be treated as loans, and there is no

Page 6 - MEMORANDUM OPINION

enforceable written loan agreement(s), as I also have determined, the two-year statute of limitations under Cal. Code Civ. Pro. § 339(1) applies from the date each advance was made. Accordingly, based on the schedule included on Page 4 of the Claim, the limitations period had run as to all but $205,000 of the Advances on the date of David's bankruptcy filing, and the balance of $375,000 of the Claim should be disallowed.

Justin argues that because David at all material times was an Oregon resident, and all but $155,000 of the Advances were deposited either in David's Oregon bank accounts or in the trust accounts of Oregon counsel, Oregon's six-year statute of limitations for contract claims under O.R.S. § 12.080 should apply. If I apply O.R.S. § 12.080 in this case, the statute of limitations would not have run by the petition date on any of the Advances included in the $580,000 Claim.

In federal bankruptcy cases, federal choice of law rules apply.

> In federal question cases with exclusive jurisdiction in federal court, such as bankruptcy, the court should apply federal, not forum state, choice of law rules. (Multiple citations omitted.) In such cases, the risk of forum shopping which is avoided by applying state law has no application, because the case can only be litigated in federal court. The value of national uniformity of approach need not be subordinated, therefore, to differences in state choice of law rules.

<u>Lindsay v. Beneficial Reins. Co. (In re Lindsay)</u>, 59 F.3d 942, 948 (9th Cir. 1995). See <u>Huynh v. Chase Manhattan Bank</u>, 465 F.3d at 997. Applying federal choice of law rules requires that I analyze the "points of contact" of a transaction to determine which state has the most relevant connections to the subject transaction. <u>Advani Enter., Inc. v. Underwriters at Lloyds</u>, 140 F.3d 157, 162 (2d Cir. 1998), quoting

Page 7 - MEMORANDUM OPINION

Lauritzen v. Larsen, 345 U.S. 571, 582 (1953).

> More concretely, this choice-of-law analysis should include an assessment of the following contacts: (1) any choice-of-law provision contained in the contract; (2) the place where the contract was negotiated, issued, and signed; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties.

Advani Enter., Inc. v. Underwriters at Lloyds, 140 F.3d at 162 (citations omitted). See also Huynh v. Chase Manhattan Bank, 465 F.3d at 997 (Court considers which state has "a more significant relationship to the parties and the occurrence").

In this case, among their other deficiencies, the Notes do not include any choice of law provisions. However, the inclusion of "Redding, California" in the amount and date line of each Note provides at least some evidence that the Notes were prepared and signed in California. Except for the last two Advances, totaling $95,000, paid to counsel in Oregon, the Advances were used to fund the needs of David's businesses in California. All of the funds for the Advances were withdrawn from Justin's bank accounts in Redding, California, although all but $155,000 of the Advances were deposited either into David's Oregon bank accounts or into the trust accounts of Oregon counsel. Justin lives in California, and David lives in Oregon, but David's businesses that ultimately received and used most of the Advances are in California.

In these circumstances, I find and conclude that overall, the most significant contacts for the loan transactions between Justin and David are in California, and the two-year statute of limitations under

Page 8 - MEMORANDUM OPINION

Cal. Code Civ. Pro. § 339(1) applies.  Accordingly, I conclude that $375,000 of the Advances included in the Claim are barred by the applicable statute of limitations, but $205,000 of the Claim is allowed as a general unsecured claim.

3. Subordination

A. § 510(a)

Section 510(a) provides that, "A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law."  As noted above, both California and Oregon follow the Restatement (Second) of Contracts which generally defines a contract as "a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty."  The parties do not disagree as to the authorities or standards for recognition and enforcement of subordination agreements in bankruptcy. See Justin Howland's Post Hearing Memorandum, Docket No. 126 ("Opposition"), at 4.  They do disagree, however, as to whether the evidence submitted at the Hearing supports a finding that an enforceable subordination agreement exists.

"A contractual subordination agreement is simply a contractual arrangement whereby one creditor agrees to subordinate its claim against the debtor in favor of the claim of another." In re Best Products Co., Inc., 168 B.R. 35, 69 (Bankr. S.D.N.Y. 1994) (citations omitted). See In re Air Safety Int'l, L.C., 336 B.R. 843, 857-58 (S.D. Fla. 2005).  A subordination agreement does not need to be in any particular form, or in writing.  See, e.g., Advanced Analytics Labs., Inc. v. Envtl. Aspecs,

Page 9 - MEMORANDUM OPINION

Inc. of N.C. (In re Envtl. Aspecs, Inc.), 235 B.R. 378, 396-97 (E.D.N.C. 1999); and In re Smith, 77 B.R. 624, 627 (Bankr. N.D. Ohio 1987). A creditor can agree with the debtor to subordinate its interests to the interests of other creditors. See, e.g., In re Envtl. Aspecs, Inc., 235 B.R. at 397. "[C]reditors may agree to subordinate their claims in a rehabilitation effort in the hope of eventual full payment." 4 Collier on Bankruptcy ¶ 510.03[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

The clearest evidence of the existence of a subordination agreement in this case was presented when, in response to my clarifying question, David confirmed that the deal with his father "was that any debt between [David] and [Justin] would be subordinated to all of [David's] other debts." Hr'g Tr. Oct. 8, 2015, at 44:5-9. Justin's counsel argues that David's testimony does not establish that Justin agreed to "this purported subordination agreement." "[T]here is insufficient evidence before the court to establish a meeting of the minds as to the existence of an enforceable subordination agreement in this matter." Opposition, at 5. However, additional circumstantial evidence tends to establish that an informal agreement did exist between Justin and David to the effect that repayment of Advances to David would not be made until David's other obligations were satisfied.

Justin testified as to his understanding that "the loans would be repaid after [David's] businesses stabilized and David was able to take sufficient distributions to repay his debt." The logical import of that testimony is that the deal between Justin and David with respect to repayment of the Advances to David was that Justin would wait for payment

Page 10 - MEMORANDUM OPINION

until David's other creditors had been satisfied, and David could repay Justin from equity distributions. That is why Justin never made demand on David for repayment of the Advances.

In addition, seven of the eight financial statements that David delivered to the Bank between August 2009 and March 2014 did not reference any loans from Justin as liabilities. (The March 12, 2014 financial statement that did reference $745,878 in "Loan Payable – Family/Friends" apparently was delivered to the Bank on or about March 18, 2014 – one day before David's chapter 7 filing.) David is an accountant. It makes no sense that David would not disclose Justin's loans to him in those financial statements unless he considered them as irrelevant to his financial situation with respect to payment of his obligations to the Bank, i.e., subordinated. In fact, David testified under questioning from Justin's counsel that "when I mentioned the word 'subordinate,' at that point in time, I knew that . . . if I got any loan, further loan, from the Bank . . . my dad's loan would never come into play because he would – he would not demand payment before I paid the Bank . . . . That's what I meant by subordination." David further testified as to his intention to repay Justin's loans to him eventually, in spite of his bankruptcy discharge.[4]

Based on the foregoing evidence, I find that there was an agreement, albeit informal, between Justin and David that repayment of the Advances to David would be subordinated to payment of the claims of David's other creditors. Accordingly, I conclude that payment of the

---

[4] Nothing in this Memorandum Opinion is to be construed as approval of a reaffirmation agreement by David as to Justin's claimed debt.

Page 11 - MEMORANDUM OPINION

Claim is properly subordinated pursuant to § 510(a).

B. § 510(c)

Section 510(c)(1) provides, in relevant part, that "the court may – (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim." In the Ninth Circuit,

> Equitable subordination **requires** that: (1) the claimant who is to be subordinated has engaged in inequitable conduct; (2) the misconduct results in injury to competing claimants or an unfair advantage to the claimant to be subordinated; **and** (3) subordination is not inconsistent with bankruptcy law.

Paulman v. Gateway Venture Partners III, L.P. (In re Filtercorp, Inc.), 163 F.3d 571, 583 (9th Cir. 1998) (quotation marks and citations omitted).

Based on the evidence submitted in this case, I find that Justin's only purpose in making the $580,000 in Advances to or for the benefit of David was to assist his son in overcoming the business difficulties he was experiencing. I find nothing inequitable in Justin's conduct in making those Advances to his son. Accordingly, I conclude that it would not be appropriate to subordinate the Claim under § 510(c).

IV. Conclusion

Based on the foregoing findings and conclusions, I will allow the Claim as a general unsecured claim in the amount of $205,000, and I will subordinate the Claim to the allowed claims of other general unsecured creditors under § 510(a). I conclude that it would not be appropriate to subordinate the Claim under § 510(c). I will enter an order consistent with the findings and conclusions in this Memorandum

Page 12 - MEMORANDUM OPINION

Opinion contemporaneously.